FILED
2019 Jun-28  AM 10:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA**

IMO US DEVELOPMENT, LLC, and IMO US
ALABAMA, LLC

              Plaintiffs,                      Civil Action No.

    v.

TRIPLE C DEVELOPMENT, INC, JAY
MACHLEIT and AMANDA MACHLEIT

              Defendants.

## COMPLAINT

Plaintiffs IMO US Development, LLC ("IMO") and IMO US Alabama, LLC ("IMO Alabama," and, together with IMO, the "IMO Plaintiffs"), by their undersigned counsel, allege for its complaint against Defendants Triple C Development, Inc. ("Triple C"), Jay Machleit and Amanda Machleit (collectively, the "Triple C Defendants") as follows:

## NATURE OF THIS ACTION

1.    The IMO Plaintiffs bring this Action to put a stop to the ongoing willful and material breaches of contract by the Triple C Defendants.  The preliminary and permanent injunctive relief sought in this Action is necessary to prevent irreparable harm to the IMO Plaintiffs by virtue of the Triple C Defendants' refusal to live up to their end of the deal they made when they sold their carwash business and associated goodwill to the IMO Plaintiffs for a purchase price of $54.5 million in September 2016.

2.    In an effort to induce the IMO Plaintiffs to agree to pay the Triple C Defendants' full asking price for the carwash business, the Triple C Defendants agreed to a series of unambiguous and specifically-negotiated restrictive covenants in the two agreements between the parties that govern both the terms of the sale of the business as well as the parties' ongoing

rights and obligations after the closing.  As the Triple C Defendants explicitly acknowledged and agreed in these key contractual provisions, the IMO Plaintiffs never would have agreed to pay the $54.5 million purchase price for the Triple C Defendants' carwash business without the Triple C Defendants' agreement to these binding restraints.  Indeed, as the Triple C Defendants specifically agreed, the protections afforded the IMO Plaintiffs by these restrictive covenants are necessary to safeguard the value of the assets and associated goodwill that the IMO Plaintiffs acquired from the Triple C Defendants.

3.     The IMO Plaintiffs paid the Triple C Defendants the entirety of the agreed $54.5 million purchase price and the IMO Plaintiffs have performed their obligations under the parties' Agreements.  Having been paid their money and achieving their objective in the deal, the Triple C Defendants now refuse to abide by their own obligations under the restrictive covenants that formed the basis of the Purchase Price.

4.     Specifically, as the IMO Plaintiffs recently learned, the Triple C Defendants are in the late stages of developing a new carwash site in Cedartown, Georgia, (the "Cedartown Carwash") in breach of the restrictive covenants of the Agreements and appear poised to open the site in July 2019.   The Triple C Defendants' Cedartown Carwash threatens to steal away customers and divert sales from the nearby carwash site that the IMO Plaintiffs bought from the Triple C Defendants in Rome, Georgia.  The unambiguous terms of the Agreements bar the Triple C Defendants from developing any carwash site in the State of Georgia (as well as certain other restricted areas delineated in the Agreements) for a period of two years following the expiration date of the MDA.  The MDA expired by its terms on September 30, 2018, and the Triple C Defendants are thus bound by the restrictions of the APA and the MDA for a period running up to and including September 30, 2020.

5.      As such, it is beyond debate that the Triple C Defendants' development activities in Cedartown are prohibited by the parties' agreements.  Nor is there any question that, in the absence of injunctive relief, the Triple C Defendants' wrongful conduct will cause the IMO Plaintiffs immeasurable and irreparable harm and will strip away the value of the assets and goodwill that the IMO Plaintiffs acquired from the Triple C Defendants.  These are the precise forms of harm that the restrictive covenants were explicitly intended to prevent.

6.      The Triple C Defendants could have attempted to negotiate a carve-out in the restrictive covenants that would have permitted the Triple C Defendants to engage in such business activities in exchange for a reduction of the Purchase Price.  The Triple C Defendants did not do so.  Instead—knowing full well that the IMO Plaintiffs never would have agreed to pay the $54.5 million purchase price without the Triple C Defendants' agreement to comply in full with the restrictive covenants—the Triple C Defendants agreed to the contracts as written. Rather than bargain for any such right, the Triple C Defendants simply decided to take the IMO Plaintiffs' $54.5 million payment and press ahead with the development of the competing business in Cedartown without any regard whatsoever to their contractual obligations to the IMO Plaintiffs.

7.      The Triple C Defendants have refused the IMO Plaintiffs' demands to discontinue their wrongful conduct despite the fact that their actions are prohibited by the restrictive covenants and threaten irreparable harm to the IMO Plaintiffs.

8.      As the parties specifically agreed in the governing contractual documents, the Triple C Defendants' breaches have caused irreparable harm and will continue to cause irreparable harm to the IMO Plaintiffs until an injunction is put in place by the Court forcing the

Triple C Defendants to comply with their obligations.  As such, the IMO Plaintiffs bring this Action to enforce their contractual rights.

## THE PARTIES

9.      Plaintiff IMO is a limited liability company organized under the laws of Delaware and maintaining its principal place of business at 6300 S. Syracuse Way, Suite 290, Centennial, Colorado 80111, USA.  IMO has one member, BOING US Holdco, Inc., a corporation organized under the laws of Delaware and maintaining its principal place of business at 6300 S. Syracuse Way, Suite 290, Centennial, Colorado 80111, USA.  IMO is a party to the APA (defined below) and the MDA (defined below).

10.     Plaintiff IMO Alabama is a limited liability company organized under the laws of Delaware and maintaining its principal place of business at 6300 S. Syracuse Way, Suite 290, Centennial, Colorado 80111, USA.  BOING US Holdco, Inc. is also the sole member of IMO Alabama.  IMO Alabama is a party to the MDA.

11.     Defendant Triple C is a corporation organized under the laws of Alabama that maintains its principal place of business at 200 Armory Road, Centre, Alabama 35960, USA.  Triple C is a party to the APA and the MDA.

12.     Defendant Jay Machleit is an individual over 18 years of age and is a citizen of the state of Alabama.  Mr. Machleit is a party and signatory to the APA.  Mr. Machleit is the controlling shareholder and the President of Triple C.  Mr. Machleit signed the APA in his individual capacity as well as in his corporate capacity as President of Triple C and its affiliated entities, C3 Install, LLC and Zippy's Car Wash, Inc.  Mr. Machleit also signed the MDA on behalf of Triple C in his capacity as President of Triple C.  Mr. Machleit is the architect of Triple C's unlawful carwash development activities in Cedartown.

13.     Defendant Amanda Machleit is an individual over 18 years of age and is a citizen of the state of Alabama.  Ms. Machleit is an employee of Triple C.  Ms. Machleit also signed the APA in her individual capacity for the purpose of agreeing to Section 4.6 of the APA.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over each of the Triple C Defendants as all Defendants are citizens of Alabama.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between the IMO Plaintiffs and each of the Triple C Defendants.  The amount in controversy exceeds $75,000.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because all the Triple C Defendants are residents of Alabama and reside in this district.

## STATEMENT OF FACTS

**A.**     **Background Relating to the Parties' Agreements and Contractual Negotiations**

17.     The IMO Plaintiffs are part of the International Car Wash Group ("ICWG"). Founded in Germany in 1965, ICWG is the world's largest carwash company and currently operates in 14 countries across the globe.  ICWG is also known under the brand name "IMO."

18.      While ICWG has long been an established brand in Europe and Asia Pacific, ICWG is a relative newcomer to the U.S. carwash market.  ICWG entered the U.S. in August 2015, and now operates carwash sites in the U.S. under three key brands: Car Wash USA Express, Goo-Goo 3 Minute Express Wash and Supersonic.  ICWG first entered the market in the southern region of the U.S. market in September 2016 when Plaintiff IMO Alabama entered the APA and agreed to purchase the carwash business of the Triple C Defendants in the transaction that is the subject of this Action.

19.    At the time of the Agreements, Defendants Triple C and Mr. Machleit were (and continue to be) well-known and established brands in these regions with substantial goodwill, recognition and customer loyalty in the carwash markets in Georgia and elsewhere in the South.

20.    The restrictive covenants that the Triple C Defendants have breached in this case are set forth in two governing agreements that were simultaneously negotiated by the parties and signed on the signed date, September 30, 2016.

21.    The first agreement is the Asset Purchase Agreement (the "APA") entered by and among Plaintiff IMO Alabama and the Triple C Defendants (as well as certain affiliates not a party to this litigation) on September 30, 2016.  Defendants Triple C and Jay Machleit signed on and agreed to all of the terms of the APA in its entirety.  Defendant Amanda Machleit, an employee of Triple C, signed the APA solely for the purpose of agreeing to abide by the restrictive covenants set forth in Section 4.6 of the APA.  A copy of the APA is attached hereto as Exhibit 1.[1]

22.    The second agreement is the Master Development Agreement (the "MDA" and, together with the APA, the "Agreements") entered by and among Plaintiff IMO and Defendant Triple C.  A copy of the MDA is attached hereto as Exhibit 2.[2]

23.    Together, these two agreements govern the sale of the Triple C Defendants' carwash business and related assets and goodwill to the IMO Plaintiffs, as well as the ongoing rights and obligations of the parties following the closing of the sale (the "Closing"), which occurred on the same date as the signing of the Agreements, September 30, 2016.  The parties agreed that each agreement would be governed by New York law.  *See* Ex. 1 § 7.6; Ex. 2 § 7.5.

---

[1]    All citations to the APA appear in the form of "Ex. 1."
[2]    All citations to the MDA appear in the form of "Ex. 2."

24.     The terms of the Agreements, and in particular the non-competition restrictions at issue here, were extensively negotiated over a nearly three month period of time between the opening of the negotiations and the signing of the Agreements.

25.     Throughout the negotiations, the Triple C Defendants were represented by experienced and specialized counsel who, based on information and belief, have substantial experience in these deals.  Specifically, the Triple C Defendants were represented by attorneys from the law firm of Gregory Harp LLC through the negotiations, the signing and the closing of the Agreements.

26.     As described in greater detail below, the primary focus of the negotiations between the parties was the terms of the restrictive covenants that the Triple C Defendants have now breached and that are the subject of the IMO Plaintiffs' claims in this Action and the IMO Plaintiffs' request for injunctive relief in this Motion.

**B.      The APA**

27.     Under the terms of the APA, IMO Alabama agreed to purchase the assets of the Triple C Defendants' carwash business and related assets and goodwill (the "Transferred Assets") for a total purchase price of $54,564,240.50 (the "Purchase Price"), subject to certain minor adjustments and additional payments as set forth in Section 1.6 and Section 1.7 of the APA.

28.     The Transferred Assets include, among other assets, twenty-four Zippy's carwashes, which, at the time, were owned by Triple C and its controlled affiliates C3 Install, LLC and Zippy's Car Wash, Inc. (collectively, the "Sellers").  One of the twenty-four Zippy's carwashes purchased was located at 2200 Shorter Ave, Rome, Georgia 30165, which is just 20 miles from the Cedartown Carwash that the Triple C Defendants are wrongfully developing.

29.     IMO Alabama also acquired the tangible assets of these carwash businesses (including inventory, real property assets, and equipment), as well as "all intangible Assets used or held for use in the Business," "all Intellectual Property of each Seller (other than the Seller Licensed used or held for use in the Business)," and "the goodwill associated with the Business of each Seller."  Ex. 1 at Ex. F §§ 1(h), 1(k).

30.     The purchase price for the twenty-four Zippy's carwashes was over $54.5 million. The purchase included not only the carwash locations and equipment and other physical assets, but also the goodwill of the Zippy's brand, valued at $26.1 million.

31.     The IMO Plaintiffs priced the deal based on the terms of the APA and the MDA as written, including the non-competition provisions discussed in greater detail below.  The IMO Plaintiffs would not have agreed to pay the $54.5 million Purchase Price for the Transferred Assets without the inclusion of the non-competition provisions precisely as written in the APA and in the MDA.

32.     The Closing Date for the APA was the same day as signing: September 30, 2016.

33.     The APA is governed by New York law.  *See* Ex. 1 § 7.6.

## C.     **The MDA**

34.     Simultaneously with, and as part and parcel of the IMO Plaintiffs' purchase of the Triple C Defendants' carwash business and the APA, IMO and Triple C entered into the MDA dated as of September 30, 2016.  Under the MDA, Triple C agreed to identify commercial property suitable for express carwash sites, develop and build out such carwash sites and then sell the developed property to IMO so that IMO could operate its express carwash business on the property.  Mr. Machleit signed the MDA on behalf of Triple C.

35.     The MDA was signed and closed on the same date that the APA was signed and closed: September 30, 2016.

36.     Like the APA, the MDA is governed by New York law.  *See* Ex. 2 § 7.5.

**D.      The Restrictive Covenants in the APA and the MDA**

37.     As a critical aspect of the overall bargain and the Purchase Price, the parties agreed to substantially similar non-competition provisions in the Agreements that restrict the activities of the Triple C Defendants, their relatives and their affiliated entities in order to protect the IMO Plaintiffs and preserve the value of the assets they purchased from the IMO Plaintiffs.

38.     The non-compete provision in the APA is set forth in Section 4.6.  In that provision, the parties specifically agreed that "Buyer is relying on the covenants set forth in this Article 4, that without such covenants, Buyer would not enter into this Agreement or consummate the Transaction, and that the Purchase Price is sufficient consideration to make the covenants and agreements set forth herein enforceable." Ex. 1 § 4.6.  The parties further agreed that "the Confidential Information and the business relationships that Sellers have developed and maintained for and on behalf of the Business contribute substantially to the goodwill of the Business, which goodwill is being acquired by Buyer as an integral part of the Transaction." *Id.*

39.     In Section 4.6.1(a), the Triple C Defendants all agreed to the restrictions set forth in the APA.  The Triple C Defendants agreed that these restrictions were a necessary part of the transaction and were required "to more effectively protect the value and goodwill of the Transferred Assets, and to induce Buyer to consummate the Transaction." Ex. 1 § 4.6.1(a). Specifically, the Triple C Defendants all covenanted and agreed that neither they nor any other Restricted Party (which is defined in the Agreement to include, among others, any family member of Jay Machleit or Amanda Machleit as well as any Affiliate of any of the Triple C

Defendants) would "directly or indirectly, individually or as an investor, lender, owner, security holder, partner, member, director, manager, officer, employee, consultant, or agent of any other Person" engage in two categories of activities throughout the period beginning on the Closing Date and ending 24 months after the expiration or termination of the MDA.  *Id.*

40.     First, the Triple C Defendants covenanted and agreed that neither they nor any Restricted Party would "directly or indirectly . . . operate, invest, engage or participate in, any business that is competitive with any portion of the Business as of the Closing Date."  *Id.* § 4.6.1(a)(A).

41.     Second, the Triple C Defendants covenanted and agreed that neither they nor any Restricted Party would "directly or indirectly":

> invest, engage or participate in the development, installation or supply of automobile cleaning or maintenance facilities or engage in the sale of equipment, buildings, chemicals or sundries used in the operation of automobile cleaning or maintenance facilities, in any location that is:
>
> (i) within any state in which any Seller has conducted the Business or has commitments to conduct the Business (other than the ROFR States) as of or prior to the Closing Date; or
>
> (ii) within any state in which Buyer or any of its Affiliates owned or leased any parcel of real property on which a car wash facility was operated as of the date immediately prior to the Closing Date.

Ex. 1 § 4.6.1(a)(B)

42.     In the APA, the Triple C Defendants also represented, warranted and agreed that each such party was "familiar with the covenants not to compete that are contained herein and [were] fully aware of such party's obligations hereunder."  Ex. 1 § 4.6.5.  In addition, the Triple C Defendants specifically agreed "that the length of the time, scope and geographic coverage" of the covenants not to compete "is reasonable given the benefits he has received hereunder" and

that such covenants "are necessary for the protection of Buyer's business interests, including the goodwill and Confidential Information being transferred by reason of the Transaction."  *Id.*

43.     Section 7.13 of the APA provides that the parties "each acknowledge and agree that the other would be damaged irreparably if any of the provisions of this Agreement were not performed in accordance with their specific terms or otherwise were breached or violated."  Ex. 1 § 7.13.  Section 7.13 further provides that the parties agree that "without posting bond or other undertaking, the other will be entitled to an injunction" and to the remedy of specific performance in the event of a breach of the terms of the Agreement, and that no party would "assert the defense that a remedy at law would be adequate or that the consideration reflected in this Agreement was inadequate or that the terms of this Agreement were not just and reasonable."  *Id.*

44.     The parties also agreed that "irreparable injury will result to Buyer if any Restricted Party, or any of their respective Affiliates breaches any of the terms of this Section 4.6."  *Id.* § 7.6.5.  The parties further agreed that, in the event of such breach or threatened breach, "Buyer will have no adequate remedy at law" and "shall be entitled to injunctive and other equitable relief."  *Id.*

45.     Put simply, under Section 4.6.1 of the APA, the Triple C Defendants specifically agreed that neither the Triple C Defendants nor any of their relatives or affiliates, would invest or in any way participate  in the development, ownership, operation, installation, or supply of carwashes in any state (other than New Jersey, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine, Delaware, New York, and Pennsylvania) in which any Seller conducted the Business or had commitments to conduct the Business as of or prior to the Closing Date.  The Triple C Defendants agreed to abide by these restrictions for a period of time

beginning on the Closing Date of the APA (*i.e.,* September 30, 2016) and ending twenty-fourth months after the expiration or termination of the MDA.

46.     The MDA expired by its terms on September 30, 2018 (with the non-competition restrictions of the MDA surviving such expiration).  Thus, the restrictive covenants of Section 4.6.1 of the APA remain effective and run through September 30, 2020.

47.     The State of Georgia, including the Triple C Defendants' Cedartown location, falls squarely within these restrictions because the Zippy's Car Wash in Rome, Georgia that the IMO Plaintiffs acquired from the Triple C Defendants was owned and operated by the Sellers prior to and as of the Closing date.  As such, the Triple C Defendants' development of that site is a breach of Section 4.6 of the APA.

48.     In addition to the restrictive covenants in the APA, Defendant Triple C agreed to substantially similar non-competition restrictions in Section 6.1 of the MDA.  The temporal and geographic scope of the restrictions in Section 6.1 of the MDA mirror Section 4.6 of the APA. Similarly, the individuals, entities and activities subject to restriction are the same in Section 6.1 of the MDA as they are in Section 4.6 of the APA.  In sum, Triple C agreed in Section 6.1 of the MDA that during the term of the MDA and for twenty-four months following its expiration or termination, neither the Triple C Defendants nor their any of their relatives or affiliates, would invest or in any way participate in the development, ownership, operation, installation, or supply of carwashes in any state (other than New Jersey, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine, Delaware, New York, and Pennsylvania) in which any Seller conducted the Business or had commitments to conduct the Business as of or prior to the Closing Date, including the State of Georgia.

49.     The term of the non-compete restrictions in the MDA is coextensive with the temporal scope of the restrictions set forth in the APA, and thus remain in effect through September 30, 2020.

50.     As such, the Triple C Defendants' Cedartown Carwash is a breach of the MDA.

E.     **The Negotiations Relating to the Non-Compete Restrictions**

51.     The unambiguous restrictive covenants in the APA and MDA were specifically negotiated by the parties and agreed upon following intensive and protracted contractual negotiations.   These restrictive covenants were so thoroughly negotiated, that the parties continued negotiations of these terms all the way up to the signing of the Agreements.

52.     Indeed, the Triple C Defendants did in fact negotiate for certain exceptions to the non-competition restrictions, including a carve-out from the prohibition on developing carwash facilities in certain states, including New Jersey, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine, Delaware, New York or Pennsylvania (each such state defined in the APA as a "ROFR State") since, at the time, the Triple C Defendants represented that they had pending development plans in those states.  Ex. 1 § 4.6.1(e)(i).  Specifically, the Triple C Defendants bargained for the right to "identify and acquire (whether through purchase, lease or otherwise) a site for development of a carwash facility" in any such ROFR State, provided that Triple C first presented IMO Alabama with the option to purchase or lease the ROFR Facility in the form of a right of first refusal.

53.     During the negotiation of the Agreements, the Triple C Defendants repeatedly objected to the inclusion of the Restrictive Covenants and attempted to limit them further.  The IMO Plaintiffs squarely rejected those efforts by the Triple C Defendants.  The IMO Plaintiffs specifically told the Triple C Defendants that the IMO Plaintiffs would not agree to the APA

without the critical protections afforded the IMO Plaintiffs by virtue of the Triple C Defendants' agreement to the full scope of the restrictive covenants as written in the executed versions of the Agreements.

54.     For the IMO Plaintiffs, the restrictive covenants were the most critical component of the transaction.  The IMO Plaintiffs specifically advised the Triple C Defendants that the IMO Plaintiffs' agreement to pay the Purchase Price for the Transferred Assets was conditioned upon obtaining an agreement from all of the Triple C Defendants to comply in full with the restrictions as set forth in the Agreements.  The IMO Plaintiffs also told the Triple C Defendants during the negotiations that any effort to remove the non-compete restrictions or further limit their application in any way—including by attempting to cut back the temporal or geographic scope— would be an absolute deal-breaker and would result in the IMO Plaintiffs walking away from the deal.

55.     As the IMO Plaintiffs specifically told the Triple C Defendants' representatives at the time, the IMO Plaintiffs priced the deal based on the inclusion of these provisions, and such provisions formed a critical aspect of the Purchase Price that IMO Alabama agreed to pay for the Triple C Defendants' carwash business.  As the IMO Plaintiffs conveyed to the Triple C Defendants, the IMO Plaintiffs would not have agreed to the deal, or signed or closed on the Agreements, without these provisions in the Agreements precisely as written.

56.     IMO would not have agreed to pay the $54.5 million asking price for the Triple C Defendants' car wash business in the absence of the restrictive covenants and the associated contractual rights to enforce such restrictions by bringing action in the courts for injunctive relief, specific performance and other equitable remedies.  Without the critical protections provided by the Restrictive Covenants, there would not have been nearly enough value in the

deal for IMO to pay the $54.5 million Purchase Price for the Triple C Defendants' carwash business.

57.    the IMO Plaintiffs determined that the two-year non-competition covenant covering the restricted geographic areas (as set forth in the Agreements) would be required to protect the IMO Plaintiffs' interests, preserve the value of its investments and justify the Purchase Price.

58.    The transaction represented the IMO Plaintiffs' initial entry into the carwash market in the southern region of the United States.  By contrast, Defendants Triple C and Mr. Machleit were and continue to be well-known and established brands in these regions with substantial goodwill and influence over Plaintiffs' targeted customers.  As the IMO Plaintiffs and the Triple C Defendants knew at the time of contracting, if the Triple C Defendants were free to reenter the market and develop carwash sites in Restricted Areas within 24 months after the expiration of the MDA, the Triple C Defendants would pose a very real threat to divert customers and sales from the IMO Plaintiffs and strip the value out of the assets and goodwill acquired by the IMO Plaintiffs in the transaction.

59.    Thus, it was critical that the Triple C Defendants agree that they, their Affiliates, and the other Restricted Parties (as those terms are defined in the APA) would refrain from any such carwash site development activities in the 24 months following the termination of the Agreements.

60.    In the IMO Plaintiffs' experience, carwashes in rural and less populated areas—such as the area in Georgia that is at issue in this Action—tend to draw customers from a wider geographic region than carwashes located in cities and other more densely populated areas.  In light of that fact, and given the wide-reaching name brand and influence in these markets held by

the Triple C Defendants, the IMO Plaintiffs determined that they would not be adequately protected unless the restrictions applied to those states where the Triple C Defendants conducted a carwash business (or had commitments to conduct a carwash business) as of or prior to the Closing Date—including the State of Georgia.

61.     Without these crucial protections, the IMO Plaintiffs determined that they would face serious risks—risks that would not justify paying the $54.5 million Purchase Price—if the IMO Plaintiffs were not given at least a 24-month runway free of competition from the Triple C Defendants in order to establish itself in these markets.  As such, the IMO Plaintiffs negotiated for, and the Triple C Defendants specifically agreed to, the non-competition restrictions in the Agreement, which include a prohibition of any carwash site development activities by the Triple C Defendants and the Restricted Parties in the State of Georgia.

F.      **IMO Has Paid the Entirety of the Purchase Price and Performed its Obligations**

62.     As agreed in the APA, IMO Alabama paid the entirety of the $54.5 million Purchase Price to Triple C.  In addition, the IMO Plaintiffs have fully satisfied their obligations under the APA and the MDA.

G.      **The Triple C Defendants' Breaches of the Restrictive Covenants in the Agreements**

63.     The IMO Plaintiffs recently learned that Defendants Triple C and Mr. Machleit are engaged in the precise conduct that is specifically prohibited by Section 4.6.1 of the APA and Section 6.1 of the MDA, in breach of the Triple C Defendants' obligations.

64.     Specifically, Defendants Triple C and Mr. Machleit are in the late stages of developing the Cedartown Carwash in Cedartown, Georgia on Highway 27 (also known as Rome Highway), and appear poised to open the site for business in July 2019, notwithstanding the fact that the Agreements specifically and unambiguously prohibit the Triple C Defendants from

participating in any way in the development, ownership or operation of any carwash business in the State of Georgia.

65.     According to public news articles, Triple C has invested in the Cedartown Carwash, has obtained zoning permits to operate this competing business, and is nearing the final stages of the development of that site, all in breach of the non-competition clauses of the Agreements.  A copy of two such news articles are attached hereto as Exhibit 3 and Exhibit 4.

66.     Located a mere 20 miles from the IMO Plaintiffs' Carwash USA Express located in Rome, Georgia, which was acquired from the Triple C Defendants in the APA, Triple C's Cedartown Carwash breaches the Agreements and threatens to draw customers and divert sales away from Plaintiff's Rome carwash and to impair the value of the assets and goodwill purchased by the IMO Plaintiffs.  These are precisely the sorts of immeasurable and irreparable harms that the Non-Competition provisions were designed to prevent.  The Triple C Defendants' failure to comply with their restrictive covenants in the Agreements constitutes a material breach of their obligations under Section 4.6.1 of the APA and Section 6.1 of the MDA.

67.     Upon learning of Triple C's carwash site development activities, the IMO Plaintiffs promptly wrote to Triple C and Mr. Machleit to put them on notice that their actions constituted an event of default and breach of their obligations under the Agreements.  The IMO Plaintiffs' letter, which was dated March 6, 2019 (a copy of which is attached hereto as Exhibit 5), further demanded that the Triple C Defendants discontinue their wrongful conduct within thirty days.

68.     After the IMO Plaintiffs sent the Triple C Defendants the notice of default on March 6, 2019, the parties engaged in discussions in an attempt to resolve the matter without Court intervention.  Those discussions recently concluded without resolution.

69.     The Triple C Defendants have apparently refused to discontinue their wrongful conduct and have continued to develop the Cedartown Carwash in breach of their obligations, despite their unambiguous agreement to refrain from such activities.  Upon information and belief, the Triple C Defendants' development activities in Cedartown are now at an advanced stage, with the Triple C Defendants gearing up to open the site for business in July 2019.

H.     **Arbitration Provisions**

70.     While each of the Agreements contain an arbitration provision, *see* Ex. 1 § 7.8; *see* Ex. 2 at § 7.7, the parties specifically agreed in both the APA and the MDA that actions (such as this action) for injunctive relief, equitable relief, and/or the remedy of specific performance may be brought in a state or federal court with jurisdiction (such as this Court).  Ex. 1 §§ 6.9, 7.8, 7.13; Ex. 2 §§ 5.3, 7.10.  In fact, the parties agreed that the irreparable harm requirement for injunctive relief is satisfied in actions (such as this action) that seek to enforce the restrictive covenants.  *See* Ex. 1 § 4.6.5; Ex. 2 § 7.10.  Specifically, the parties "agree[d] that, in the event of any such action for specific performance in respect of such breach or violation, it w[ould] not assert the defense that a remedy at law would be adequate . . . ." Ex. 1 § 7.13; Ex. 2 § 7.10; *see also* Ex. 1 § 4.6.5 (stating in the event of a breach of the non-competition clause, in particular, IMO would have no adequate remedy at law). Moreover, Defendants expressly waived by contract any argument that a bond is required in this action, as Defendants specifically agreed that Plaintiffs "without posting bond or other undertaking [are] entitled to an injunction or injunctions to prevent breaches or violations of [these Agreements] and to enforce specifically [these Agreements] in any claim, action, cause of action or suit (whether in contract or tort or otherwise), litigation (whether at law or in equity. . . ." *See* Ex. 1 § 7.13; MDA § 7.10.  As a result of these binding contractual acknowledgements and agreements by Defendants, Plaintiffs

here are entitled to injunctive relief and the remedy of specific performance to put an end to Plaintiffs' breaches of the Agreements, and Plaintiffs are contractually bound not to raise irreparable harm as a defense and contractually bound not to seek a bond.[3]

71.     Additionally, the parties' Agreements provide that arbitration of disputes will be conducted according to either the JAMS Streamlined or JAMS Comprehensive Arbitration Rules and Procedures, depending on the amount of the claim.  *See* Ex. 1 § 7.8; *see* Ex. 2 § 7.7.  Both the JAMS Streamlined and JAMS Comprehensive Arbitration Rules and Procedures provide that "[a]ny recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate."  JAMS Comprehensive Arbitration Rules & Procedures, Rule 24(e); JAMS Streamlined Arbitration Rules & Procedures, Rule 19(d).

### COUNT I
### SPECIFIC PERFORMANCE

72.     The IMO Plaintiffs repeat and re-allege each of the allegations set forth in Paragraphs 1 through 71 hereof, as if fully stated herein.

73.     Section 4.6.1 of the APA and Section 6.1 of the MDA unambiguously bar the Triple C Defendants from, *inter alia*, operating, developing, investing in, engaging in, or participating in any carwash business in any Restricted Area—including Georgia—for a period of twenty-four months following the termination of the MDA, which occurred on September 30, 2018.

---

[3] Plaintiffs also have claims for damages and indemnification caused by the breaches of contract outlined in this Complaint as well as other wrongful conduct of Defendants.  As set forth in Sections 6.9 and 7.8 of the APA and Section 7.7 of the MDA, Plaintiffs will pursue those claims for monetary damages in arbitration before JAMS.

74.     Despite the clear prohibition of Section 4.6.1 of the APA and Section 6.1 of the MDA, the Triple C Defendants have invested in and are developing a competing carwash a mere 20 miles away from IMO's Car Wash USA Express located in Rome, Georgia.

75.     The Triple C Defendants' investment in and development of its competing Cedartown Carwash is a material breach of Section 4.6.1 of the APA and Section 6.1 of the MDA.

76.     As a result of such breach, IMO will suffer damages, has no adequate remedy at law, and in the absence of specific performance, will suffer irreparable harm.

77.     Pursuant to Section 7.13 of the APA and Section 7.10 of the MDA, the Triple C Defendants acknowledged and agreed that IMO "would be damaged irreparably if any of the provisions of t[his Agreement] were not performed in accordance with their specific terms or otherwise were breached or violated."   the Triple C Defendants "further agree[d] that, in the event of any such action for specific performance in respect of such breach or violation, it will not assert the defense that a remedy at law would be adequate . . . ."

78.     As such, the IMO Plaintiffs are entitled to an order of specific performance commanding the Triple C Defendants to comply with their obligations and directing and requiring the Triple C Defendants to cease development of the Cedartown Carwash immediately and at all times through September 30, 2020.

**COUNT II**
**INJUNCTIVE RELIEF**

79.     The IMO Plaintiffs repeat and reallege each of the allegations made in Paragraphs 1 through 78 hereof, as if fully stated herein.

80.     The IMO Plaintiffs have established a probability of success on the merits on Count I.

81.     The IMO Plaintiffs will be harmed irreparably if the Triple C Defendants are permitted to develop, own or operate the Cedartown Carwash because such harms are immeasurable and the IMO Plaintiffs will not be able to obtain adequate monetary damages to compensate for the IMO Plaintiffs' loss of customers and goodwill and because the Triple C Defendants specifically acknowledged and agreed in the Agreements that the IMO Plaintiffs would suffer such irreparable harm in the event of the Triple C Defendants' non-compliance with the non-competition restrictions of the APA and the MDA.

82.     Pursuant to Section 7.13 of the APA and Section 7.10 of the MDA, the Triple C Defendants acknowledged and agreed that the IMO Plaintiffs "would be damaged irreparably if any of the provisions of t[he Agreement]  were not performed in accordance with their specific terms or otherwise were breached or violated."  The Triple C Defendants "further agree[d] that, in the event of any such action for specific performance in respect of such breach or violation, it will not assert the defense that a remedy at law would be adequate . . . ."

83.     Furthermore, in Section 7.13 of the APA and 7.10 of the MDA, the Triple C Defendants "agree[d] that, without posting bond or other undertaking, [IMO] will be entitled to an injunction or injunctions to prevent breaches or violations of this MDA and to enforce specifically this MDA in any claim, action, cause of action or suit (whether in contract or tort or otherwise), litigation . . .in addition to any other remedy to which it may be entitled, at law or in equity . . . ."

84.     Both the balance of the equities and the public interest favor the IMO Plaintiffs, who fully performed all of their obligations under the Agreements.

85.     Because the IMO Plaintiffs are likely to prevail on the merits of their claims, because the IMO Plaintiffs will be irreparably harmed by the Cedartown Carwash and because

the IMO Plaintiffs lacks an adequate remedy at law, the IMO Plaintiffs are entitled to injunctive relief enjoining the Triple C Defendants from participating in any way in the development, ownership or operation of the Cedartown Carwash through the full period of the non-compete restrictions up to and including September 30, 2020.

**PRAYER FOR RELIEF**

**WHEREFORE**, the IMO Plaintiffs respectfully request that this Court enter final judgment in Plaintiffs' favor as follows:

(i)     ordering specific performance requiring the Triple C Defendants to comply in full with the restrictive covenants of Section 4.6.1 of the APA and Section 6.1 of the MDA and requiring the Triple C Defendants to cease development of the Cedartown Carwash immediately and for a period running up to and including September 30, 2020;

(ii)    granting preliminary and permanent injunctive relief immediately enjoining the Triple C Defendants from directly or indirectly investing, engaging or participating in, the development of the Cedartown Carwash or any other carwash site in any Restricted Area, in their individual capacities, corporate capacities, or as an investor, lender, owner, security holder, partner, member, director, manager, officer, employee, consultant or agent of any other Person, for the entirety of the period running up to and including September 30, 2020;

(iii)   granting preliminary and permanent injunctive relief immediately enjoining the Triple C Defendants from directly or indirectly operating, investing, engaging or participating in, any carwash business at the Cedartown Carwash or any other carwash site in any Restricted Area, in their individual capacities, corporate capacities, or as an investor, lender, owner, security holder, partner, member, director, manager, officer,

employee, consultant or agent of any other Person, for the entirety of the period running up to and including September 30, 2020;

(iv)     awarding attorneys' fees, costs, and other related expenses; and

(v)     granting such further and other relief as this Court deems just and proper.

Dated: June 27, 2019

Respectfully submitted,
/s/ R. Brooke Lawson III
**R. BROOKE LAWSON III (ASB-5459-L63R)**
**BARBARA J. WELLS (GIL037)**

**OF COUNSEL:**
**CAPELL & HOWARD, P.C.**
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, AL 36102-2069
Telephone: (334) 241-8000
Facsimile: (334) 323-8888
Email: Brooke.Lawson@chlaw.com
Email: Barbara.Wells@chlaw.com

William Schwitter (*pro hac vice* application to be submitted)
Bradley S. Pensyl (*pro hac vice* application to be submitted)
Rebecca Naeder (*pro hac vice* application to be submitted)
**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: 212-610-6300
Facsimile: 212-610-6399
Email: william.scwhitter@allenovery.com
Email: bradley.pensyl@allenovery.com
Email: rebecca.naeder@allenovery.com

*Attorneys for Plaintiffs IMO US Development, LLC and IMO US Alabama, LLC*

**PLEASE SERVE DEFENDANTS AT THE FOLLOWING ADDRESSES:**

Triple C Development, Inc.
c/o Registered Agent Jay Machleit
905 CO RD 528
Centre, AL 35960

Jay Machleit
905 CO RD 528
Centre, AL 35960

Amanda Machleit
905 CO RD 528
Centre, AL 35960